**RHEEM MANUFACTURING COMPANY, Plaintiff,**

v.

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Defendant.**

Civ. No. 94–2056.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Dec. 8, 1994.

Hugo Swan, Abraham W. Bogoslavsky, Kathleen Hillegas, McGlinchey, Stafford & Lang, Ft. Smith, AR, for plaintiff.

Terence G. Craig, Central States Funds, Rosemont, IL, Melva Harmon, Little Rock, AR, for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

In this declaratory judgment action, Rheem Manufacturing Company (Rheem) seeks a declaration that it is not an "employer" under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), codified at 29 U.S.C. §§ 1381–1453. The matter is currently before the court on cross-motions for summary judgment, and the sole question

before this court is whether a joint employer is an "employer" for purposes of assessing withdrawal liability under MPPAA.

■ This is a question of first impression for the Eighth Circuit, and there is no applicable direct precedent in any circuit. The court holds that the term "employer" under MPPAA does not include joint employers. Accordingly, summary judgment will be for plaintiff Rheem.[1]

## I. BACKGROUND

The defendant, Central States, Southeast & Southwest Areas Pension Fund (Central States) is a multiemployer pension plan. Rheem Manufacturing is a corporation that has for a long time operated a facility in Fort Smith, Arkansas, where it engages in the manufacture of heating and air conditioning equipment.

For over twenty years, from approximately June 6, 1965 to approximately June 6, 1991, Rheem leased a group of about fifteen (15) truck drivers from a company called Knight Associates (Knight) to haul finished products from Fort Smith to Rheem dealers nationwide. Pursuant to this lease, Knight furnished drivers to operate vehicles for Rheem, and Rheem remitted payments to Knight in accordance with the number of drivers leased and the number of miles driven. (See also Pl. Mot. Summ. J., Aff. of Hank Galske).

Under their agreement, both Knight and Rheem shared control over the daily working conditions of the truck drivers, and in fact, Rheem exercised the lion's share of control. In fact, Knight's sole business activity was to act as the employer for employees leased to Rheem; Knight's employees were selected for employment by Rheem; Knight never met or interviewed any of its leased employees prior to their being placed on Knight's payroll by direction of Rheem; Knight was required to hire and lease back to Rheem each person whose name was submitted to Knight by Rheem; Knight had no control over the working conditions of the leased employees; the leased employees did not

---

1. See generally Brian H. Redmond, J.D., What Constitutes "Employer" for Purposes of Employer's Withdrawal Liability Under Multi-employer Pension Plan Amendments Act of 1980 (29 USCS §§ 1381 et seq., 95 A.L.R.Fed. 703 (1989).

wear Knight uniforms, or drive Knight trucks, or carry Knight identification; Knight did not negotiate with the union over the terms and conditions of the leased employees work; Knight signed the collective bargaining agreement proffered by the union (the Teamsters National Master Freight Agreement) pursuant to its agreement with Rheem; Knight had no power to fire or replace any of the leased employees; and Knight would terminate the employment of a leased employee only upon the instruction to do so from Rheem. (Def. Resp. Pl. Mot. Summ. J., Aff. of Dorothy Alexander).

As for Knight's responsibilities under the agreement, Paragraph 6 provided that Knight would pay all wages and provide all benefits required by the applicable collective bargaining agreement. Pursuant to a collective bargaining agreement to which it was a party, Knight made contributions to Central States pension fund on behalf of the leased drivers.

On or about June 15, 1991, Rheem terminated its agreement with Knight and transferred the leased drivers to a company called Leaseway Personnel Corporation.[2] Knight subsequently ceased its contributions to Central States, and Central States notified Knight that it had incurred withdrawal liability under 29 U.S.C. § 1381. Central States then assessed Knight for $80,435.96 in withdrawal liability, and Knight paid $21,182.00 of that amount.

To collect the remaining balance, Central States turned to Rheem. On January 28, 1994, Central States sent Rheem a formal Notice and Demand for Payment of Withdrawal Liability, which demanded that Rheem pay Knight's remaining withdrawal liability. Rheem maintained that it was not an "employer" under the MPPAA, that Knight was, and that Rheem thus was not liable for withdrawal payments. Central States countered that Rheem was liable for withdrawal liability as it was a joint employer with Knight.

On March 25, 1994, Rheem commenced this declaratory judgment action, asking this court to determine whether or not it is an "employer" under MPPAA. On May 13, 1994, this court denied defendant's motion to dismiss, holding that Rheem's status as an "employer" under MPPAA is properly resolved by a federal court, rather than an arbitrator. Both parties have now moved for summary judgment on the central question in the case—whether Rheem is an "employer" for purposes of assessing withdrawal liability under MPPAA.

## II. THE MPPAA TERM "EMPLOYER"

Congress passed MPPAA as an amendment to ERISA to protect multiemployer pension plans from the financial burdens that result when a particular employer withdraws from the plan and leaves the plan with unfunded liabilities.

Under the provisions of the MPPAA, before a party can be assessed with withdrawal liability, that party must be an "employer." The relevant provision of MPPAA provides as follows.

§ 1381. Withdrawal liability established; criteria and definitions

(a) If an *employer* withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

29 U.S.C. § 1381(a) (emphasis supplied).

MPPAA itself contains no definition of the term "employer," and determination of who is an "employer" for purposes of MPPAA is one for the courts. The Eighth Circuit recently defined the term employer as "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Seaway Port Authority v. Duluth–Superior ILA Marine*, 920 F.2d 503, 507 (8th Cir.1990) (citations omitted), *cert. denied, Duluth–Superior ILA Marine v. Seaway Port Authority*, 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

---

2. The entire controversy between the parties involves the period of time when Rheem leased its employees from Knight. As such, there is no need to discuss the parties' relationships with Leaseway in any detail.

In applying the above definition, the Eighth Circuit has emphasized that the most important consideration is whether the alleged "employer" had an obligation to contribute and the nature of that obligation. In the words of the Eighth Circuit,

> There is a paucity of case law applying this definition [of "employer" under MPPAA]; what case law there is, however, ... makes clear that the appropriate inquiry is *whether the alleged employer had an obligation to contribute and what was the nature of that obligation.*

*Id.* at 508 (emphasis supplied).

## III. OBLIGATION TO CONTRIBUTE

■ Upon careful review of the Eighth Circuit's opinion in *Seaway, supra,* this court is convinced that, in order to be an "employer" under MPPAA, a party must have an obligation to contribute that is purely *contractual* in nature. That is, Rheem must have signed a contract obligating it to contribute to Central States, or it must be obligated by some other principle of traditional contract law, such as agency or alter ego theory. As will be discussed later, Central States contests this reading of *Seaway* and argues that an obligation to contribute need not be purely contractual, but may also be imposed by "applicable labor-management relations law."

In *Seaway,* an entity known as the SPAD owned and operated a public marine terminal. SPAD contracted with a management company, NCTO, to act as the managing agent for all terminal operations. The contract provided that NCTO was to act as the employer for all operating personnel, including signing any necessary collective bargaining agreements. The contract also provided that NCTO would maintain a separate payroll account into which SPAD would deposit funds to enable NCTO to meet its payroll and fringe benefit expenses.

When NCTO and SPAD ended their relationship, NCTO withdrew from the pension plan, so the pension plan sought to hold SPAD accountable for NCTO's withdrawal liability. SPAD brought an action for declaratory judgment that it was not an "employer" under MPPAA. The Eighth Circuit held that SPAD was not an "employer", because it had no contractual obligation to contribute.

> [A] review of the relevant case law reveals one fact common to all of the parties held subject to withdrawal liability: *they were contractually bound to make pension contributions,* either in collective bargaining agreements, general cargo agreements, or shipping association agreements. *Cf. also Laborers Local 938 v. B.R. Starnes Co.,* 827 F.2d 1454, 1456–57 (11th Cir.1987) (per curiam) (holding that ERISA's definition of employer does not include persons other than signatory employers). In this case, it is undisputed that SPAD did not sign any collective bargaining agreements.... Our review of the record does not reveal any contracts SPAD signed explicitly obligating it to make pension contributions. Thus, applying relevant case law, SPAD is not obligated to contribute and is not an employer under MPPAA.

*Seaway,* 920 F.2d at 509.

The Eighth Circuit acknowledged that its ruling could allow parties to avoid withdrawal liability by carefully crafting their contracts, and that such results may appear unfair, but the court concluded that such appearances were tolerable.

> The Trustees contend that our requiring an entity to sign a contract explicitly obligating it to provide pension contributions before the entity is an "employer" under the MPPAA would defeat the purposes of ERISA. They argue that true employers will simply require their managing agents to sign all relevant agreements, and then claim no obligation to contribute when the agent withdraws. There is nothing inherently improper in this, however, because parties may contract as they see fit, within certain limitations. A pension plan's proper recourse in such a situation is to assess withdrawal liability against the managing agent. The Trustees further argue that true employers may hire insolvent sham agents, require them to sign all agreements, and thus avoid withdrawal liability. We are not faced with such a situation in this case.

*Seaway,* 920 F.2d at 510.

In sum, this court is convinced that the Eighth Circuit intended to limit the term

"employer" under MPPAA to parties with a contractual obligation to contribute.[3]

## IV. RHEEM HAD NO CONTRACTUAL OBLIGATION TO CONTRIBUTE

■ Applying the principles of *Seaway* to the present case, it appears that Rheem had no contractual obligation to contribute to the pension fund, and thus was not an "employer" under MPPAA. An analysis of the terms of the leasing agreement between Rheem and Knight make it clear that Rheem successfully insulated itself from any contractual liability for employee wages and benefits. According to Paragraph 6 of the leasing agreement, Knight was the sole employer of the truck drivers and had sole responsibility for paying their wages and benefits. In the words of the leasing agreement, "the drivers are, and will continue to be, [Knight] employees. [Knight] will pay the drivers' wages and provide all of the benefits required by any applicable collective bargaining agreement which may be in effect from time to time."

Furthermore, Rheem's payments to Knight were calculated solely as a function of the number of drivers used and the number of miles driven, and apparently the amount of employee wages and benefits paid by Knight did not enter into the calculation. (See Schedule A of Leasing Agreement; Pls' Mot. Summ. J., Aff. of Hank Galske). Finally, Rheem never signed any collective bargaining agreement that obligated it to pay employee wages or benefits. In this manner, Rheem successfully insulated itself from contractual liability for employee wages and benefits.

These facts are very similar to those in *Seaway*, where the alleged "employer", SPAD, was not a party to any contract with the pension fund, and where the agreement between the alleged "employer" and its managing agent, NCTO, provided that "payroll expenses and fringe benefits are NCTO's

responsibilities, not SPAD's." *Id.*, 920 F.2d at 509 n. 5.

## V. JOINT EMPLOYER DOCTRINE

In response to plaintiff's contention that, in order to be an "employer" under MPPAA, a person must have a purely contractual obligation to contribute, Central States contends that MPPAA itself defines the term "obligation to contribute" to also include obligations imposed under "applicable labor-management relations law."

§ 1392. Obligation to contribute

For purposes of [MPPAA], the term "obligation to contribute" means an obligation to contribute arising—

(1) under one or more collective bargaining (or related) agreements, or

(2) *as a result of a duty under applicable labor-management relations law,* but

does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

29 U.S.C. § 1392 (emphasis supplied).

In reliance on this section, Central States argues that Rheem had an obligation to contribute "under applicable labor-management relations law" and is thus an "employer" under MPPAA. Central States' reaches this conclusion by arguing that (1) Knight and Rheem were joint employers of the truck drivers; (2) Knight had a contractual obligation to contribute under a collective bargaining agreement with the truck drivers' union; and (3) Rheem was bound by the same collective bargaining agreement as a non-signatory joint employer.

(For purposes of this opinion, this court will assume that Central States' version of labor-management relations law is accurate. However, the court emphasizes that it has not made any ruling that Knight and Rheem are joint employers, although from the evidence presented, such status seems quite

---

**3.** Although the court in *Seaway* does refer occasionally to the requirement of a signature on a contract, there is no reason to suppose that the signature of an agent or an alter ego, under traditional principles of contract law, would not

work just as well. *See e.g., Seaway*, 920 F.2d at 507–509 *citing Bowers v. Tranportacion Maritima Mexicana*, 901 F.2d 258 (2d Cir.1990) (alleged employer did not sign contract, but association with authority to bind employer did).

possible.[4] Furthermore, even if Rheem and Knight are joint employers, the court emphasizes that it has not made any ruling that Rheem would be obligated under any collective bargaining agreements signed by Knight, although it is entirely possible that such liability exists under labor-management relations law.[5])

Assuming that Rheem is obligated to contribute as a joint employer under labor-management relations law, it still would not be an "employer" under MPPAA. After careful review of *Seaway*, this court concludes that a non-contractual obligation to contribute incurred as a joint employer does not make a person an "employer" under MPPAA.

The court reaches this conclusion for two reasons. In the first place, an opposite holding would conflict with the *Seaway's* clear requirement that an "employer" under MPPAA must have a purely contractual obligation to contribute. And second, an opposite holding would conflict with *Seaway's* requirement that an "employer" under MPPAA must be either a "direct employer" or acting "in the interest of an employer." The court will now discuss each reason in turn.

First of all, a joint employer with a non-contractual obligation to contribute is not an "employer" under MPPAA, because *Seaway* holds that an alleged "employer"'s obligation to contribute must be contractual in nature. To the extent that labor-management relations law creates a range of liability broader than what exists under contract law, it is not a part of MPPAA's definition of an "employer".

In the second place, a joint employer with a non-contractual obligation to contribute is

---

**4.** *See generally, Annotation, When are Separate Business Entities "Joint Employers" of Same Employees for Purposes of Application of Federal Labor Laws,* 73 A.L.R. Fed. 609 (1985).

**5.** The precedent on this subject is nonconclusive, although the joint employer question has been raised in a surprising number of cases, many of them unreported. It is fascinating that an issue has been raised in litigation so many times, without a definitive answer ever being reached. Just in case the question need be resolved at a later stage of this litigation, the court provides the following survey of cases, some of which arise under the delinquent contributions provision of ERISA, and some of which arise under Section 301 of the Labor–Management Relations Act.

Many of the cases raising the question of whether a joint employer can be bound to a collective bargaining agreement never actually decide the issue. These cases simply dismiss the case on the grounds that there is no joint employer relationship. *See e.g. Local Union 98, IBEW v. Lott,* 1987 WL 4942, 1987 U.S. Dist. LEXIS 3777 (E.D.Pa. May 7, 1987); *Bechtel Constructors v. Detroit Carpenters Dist.,* 610 F.Supp. 1550, 1558–59 (D.Mich.1985); *General Drivers, Etc., Loc. U. 89 v. P.S.C. of Indiana,* 705 F.2d 238 (7th Cir.1983); *Kaylor v. Crown Zellerbach,* 643 F.2d 1362 (9th Cir.1981); *Voss v. Supermail/Western Union,* 675 F.Supp. 1210, 1213 (S.D.Cal.1987); *Russom v. Sears, Roebuck,* 415 F.Supp. 792, 796 (E.D.Mo.1976), *aff'd,* 558 F.2d 439 (8th Cir.), *cert. denied,* 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977).

Some courts decide the issue definitively, one way or the other, but the precedent they rely upon does not actually support their position. *See e.g. Laborers Intern. Union v. HSA Contractors,* 728 F.Supp. 519 (E.D.Wis.1989); *Newmark & Lewis, Inc. v. IBT,* 776 F.Supp. 102, 106 (E.D.N.Y.1991); *Hardy v. Kaszycki & Sons Constr.,* 870 F.Supp. 489 (S.D.N.Y.1994).

Some courts reach a definitive holding that a joint employer cannot be held vicariously liable, and then rely upon a second holding to reinforce what they must consider to be a shaky first holding. *See e.g. Sheetmetal Workers Union v. Public Service Co,* 771 F.2d 1071, 1074 (7th Cir. 1985); *USFL Players Ass'n, AFL–CIO v. USFL,* 650 F.Supp. 12, 15 (D.Or.1986).

One court allowed a claim against a joint employer to survive a motion to dismiss, but in that case there was also a pendent claim of alter ego nonsignatory liability, which would have allowed the action to survive a motion to dismiss in any case even under traditional contract law. *Cruz v. Robert Abbey, Inc.,* 778 F.Supp. 605, 610–11 (E.D.N.Y.1991).

For this court, the most accurate statement of the unsettled state of the law is provided by *Metropolitan Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.,* 672 F.2d 580, 583, n. 5. (6th Cir.1982). In that case, the court dismisses a claim against an alleged joint employer, and then adds that

"Even if [defendant] Hoetger were a joint employer, it may not necessarily follow, in the absence of Hoetger's contractually undertaking liability under the collective bargaining agreement, that it would be liable to appellees for the fringe benefits provided by the agreement. Because we decide that Hoetger and Hawkins were not joint employers, it is not necessary to reach that issue."

In short, it is hopeless to look for precedent on this issue, and the court will have to return to first principles to decide the issue should it ever again be presented.

not an "employer" under MPPAA, because *Seaway* requires that an "employer" must be either: (1) a direct employer, or (2) acting "in the interest of an employer." *Seaway*, 920 F.2d at 507). Thus, even if Rheem has a non-contractual obligation to contribute as a joint employer, it still would not be an "employer" under MPPAA because: (1) it would not obligated as a "direct employer" of the leased employees, because Knight was the direct employer; and (2) it would not be obligated "in the interest of the employer," but rather in its own interest as joint employer. (If Rheem had contractually agreed to contribute, this definitional problem would be avoided.) Thus, Central States is basically arguing that Rheem had an obligation to contribute, not as a "direct employer," and not "in the interest of the employer," but rather as a "joint employer." The *Seaway* definition of "employer" does not appear to allow for this possibility. In fact, the use of the term "direct employer" by the Eighth Circuit is evidence of an intention to exclude the use of the joint employer doctrine′in the MPPAA context.

For these reasons, the court holds that a joint employer with a non-contractual obligation to contribute to a pension fund is not an "employer" under MPPAA.

## VI. CONCLUSION

The court need not spend any time speculating on the reasons why the Eighth Circuit decided, albeit implicitly, that the joint employer doctrine is not a part of MPPAA's definition of "employer". It may be that the joint employer doctrine is not "applicable labor-management relations law." (The term "applicable" indicates that the courts have some leeway in deciding what is applicable and what is not.) On the other hand, it may be that the Eighth Circuit defined the term "employer" as a matter of federal common law without ever intending to refer to the statutory definition of the term "obligation to contribute." In any case, all this court must do is determine that *Seaway* precludes application of the joint employer doctrine; it need not speculate on exactly how or why the Eighth Circuit reached that result.

The court notes that three cases have previously addressed the withdrawal liability of joint employers under MPPAA, although these cases were not cited by the parties. Two of them reached a result directly opposite to the one reached by this court today, but these cases utilized a definition of "employer" under MPPAA which was expressly rejected by the Eighth Circuit in *Seaway*. *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.*, 645 F.Supp. 996 (E.D.Pa.1985), *disapproved by Seaway, supra; American Stevedoring Corp. v. Burlington Industries, Inc.*, No. 85–4180, 1985 WL 5057 (N.D.Ill. December 19, 1985). A third case raised the joint employer question, but the case was dismissed on the grounds that the parties before the court were not joint employers. *Refined Sugars, Inc. v. Local 807 Labor–Management Pension Fund*, 632 F.Supp. 630 (S.D.N.Y.1986).

The Pension Benefits Guaranty Corporation has also issued two opinions directly addressing whether a joint employer is an "employer" under MPPAA. Both opinions reached a result directly opposite to the one reached by this court today, but these opinions do not provide authority for the federal courts. Pension Benefits Guaranty Board Opinion Nos. 85–14 and 86–10.

IT IS SO ORDERED.